## J. W. FLEMING v. ELIZABETH C. DAVIS.

1. See the opinion in this case for principles of the common law on the subject of water courses, recognized as in force in this State in cases not affected by laws of former governments.

2. Irrigation of land, however beneficial in some portions of this State, is not one of the natural wants which will justify the owner of a head spring in exhausting the water which flows from it, to the injury of proprietors lower down on the natural channel of the stream. The maxim *sic utere tuo ut alienum non lædas* applies. The case of Tolle v. Correth, 31 Texas, 362, is not understood to have decided a contrary doctrine.

3. In the distribution of the water of a natural stream among the riparian proprietors, the principles of the common law furnish the only rules judicially known in this State; and a suit, it seems, cannot be sustained, to partition a natural stream among riparian proprietors, by allotting to each a specified time to appropriate its waters.

APPEAL from San Saba. Tried below before the Hon. William Lewis.

The leading facts of the case are stated in the opinion of the court.

The jury found generally for the plaintiff, and assessed her damages at seventy-five dollars. The court below rendered judgment against Fleming for that amount, and then proceeded to recite that all the parties were interested in the water of the stream for irrigation purposes, and to enjoin Fleming from taking or diverting more than three-sevenths of its waters.

In view of the opinion of this court, there appears to be no occasion to detail the evidence.

Cases of this character being of unusual occurrence, and the questions presented being of practical importance in a very large section of this State, it is deemed well to afford space for liberal extracts from the very able arguments of the counsel who contested the cause in this court.

*Moore & Shelley*, for the appellant. The issues which were submitted to the jury, and the principles of law by which they were to be guided, as will be seen from the instructions given by the court, are :

*First.* A riparian proprietor can only use the water of a stream for any purpose as it passes along, and can make no use of it which materially diminishes its quantity, but must suffer it to flow with its accustomed volume, without material diminution, to the proprietors below.

*Second.* All riparian proprietors have equal rights for all purposes in respect to the use of water in a running stream.

*Third.* The uses of water are natural or artificial. Natural are such as are absolutely necessary to the existence of man; and irrigation is not a natural use of water, unless where it is absolutely indispensable for the cultivation of the soil, and where without it sufficient food to support life cannot be raised. A proprietor may consume as much water as is necessary to supply a natural want, even though it be all the water in the stream.

But the jury are afterwards instructed that there is no exclu-

sive use of water even for natural wants, but it must be apportioned and divided between the riparian proprietors, according to the necessities and numbers of their families, servants, and domestic animals.

*Fourth.* For supplying artificial wants the use of the water of a running stream is to be divided among the riparian proprietors, according to their necessities, the number of their families, servants, and domestic animals.

*Fifth.* If one riparian proprietor uses more of the water of a running stream to supply his artificial wants than his reasonable share, he is liable to the others in damages.

With due deference to his honor, who presided on the trial of this case in the court below, and the very able and distinguished attorneys by whom this suit was brought and prosecuted for the plaintiff and intervenors, and under the shadow of whose reputation and acknowledged great ability as advocates and jurists, the clear judgment of the court, as well as jury, was obscured, we submit that the instructions given the jury are not only unquestionably inaccurate, but obviously erroneous as legal propositions, as well as plainly and palpably contradictory, and calculated to confuse and mislead the jury. And it is equally apparent that the judgment of the court is not supported by the verdict of the jury, and is based upon the opinion of the court deduced from evidence submitted to the jury, but upon which there was no finding, and upon legal views dissimilar from and contradictory to those contained in the instructions to the jury. And for these, as well as other errors patent on the face of the record, we think, unquestionably, the judgment must be reversed. And if it was not for the great public, as well as individual, interest involved in the question—the right to the use of water for irrigation—for the determination of which this suit was evidently brought, we would not feel called upon to do more than suggest to the court the errors we have indicated. As it is, we hesitate to do more ; for it seems to us that this question, as to the right of the upper proprietor to the use of all of the water of the stream

for irrigation, if necessary, has been fully passed upon and decided by this court in the case of Tolle *v.* Correth, 31 Texas, 362. Unquestionably, but for the addendum of the last paragraph to the opinion, which was made by the judge who wrote the opinion after it was read in court, it could hardly be claimed, we imagine, that this case does not come within the decision of the court in that case. Nor can we see that this addendum in any way weakens the principles of law announced by the court in the opinion, which are clearly applicable to the facts in this case.

The first, and therefore leading, instruction given to the jury is, that water of a running stream cannot be consumed or diverted by the upper proprietor, but it must be permitted to run in its natural channel with its accustomed volume. This instruction is certainly inaccurate under the most stringent rules of the common law, when and wherever applied to the right to the use of water of a running stream by riparian proprietors. Even in England, with its humid and moist climate, and in the northern States of America, where the snows of winter and the perennial showers of summer justify the most liberal construction and application of the maxim *aqua currit et debet currere ut currere solebat*, it has never been questioned or denied, that all the water of a running stream may be consumed or diverted for what are termed the natural uses of water. And if *bona fide*, and prudently and economically used and consumed for such purposes by an upper proprietor, those below have no right to complain. The doctrine for which the appellees insisted in this aspect of the case, cannot be more favorably stated for them than it is put by the Supreme Court of Nevada, in the case of Lobdell *v.* Simpson, 2 Nevada, 274, where the court says: " The clear and well-settled general " doctrine of the common law is that the water of a natural " stream can in no case be diminished, to the prejudice of other " proprietors, except when necessary for domestic uses, and for " watering of stock. If a reasonable use of the water for " these purposes materially diminishes the quantity, to the

" prejudice of the proprietors below, no action will lie, because
" these are considered privileged uses. Some of the courts
" hold that it might also be taken for the purpose of irri-
" gating land, though the proprietors below were prejudiced
" thereby; the weight of authority, however, seems to be
" against these decisions." And to the same effect is the case
of Evans v. Merriweather, 3 Scam. (Ill.), 496, which seems to
be the authority mainly relied on by appellees in support of
their other propositions.

It may be said, however, that, although the charge given by
the court upon this first proposition assumed by appellees is
erroneous, no injury could result from it to appellant, be-
cause it was immaterial to the facts of the case, in so far as it
was wanting in the proper qualification, unless irrigation was
one of the natural uses of water, and in that respect it was
sufficiently qualified and explained in the subsequent instruc-
tions. To this we answer, if immaterial, it should not have
been given, and it was for that reason, if no other, improper,
and calculated to mislead and confuse the jury. But, more
than this, it went to the jury as an absolute and unconditional
proposition, by which they were told that appellant could
not use the water (even, if under other instructions, he used it
for irrigation as a matter of absolute necessity, to raise sufficient
food to support his family), to the prejudice of appellees, who
in this respect had equal rights with him; or, in other words,
even in respect to its natural or absolute and essential uses,
the courts can and will divide the water in a running stream
among the riparian proprietors. In this point of view, the
charge now in question contradicts and also agrees with the
subsequent instructions, as to the division and apportionment
of the water between the parties, upon which we will comment
hereafter.

The second proposition contained in the instructions given
at the request of appellees, is that the rights of riparian pro-
prietors to the use of running water is in all respects the same,
without regard to the nature or character of the use, and con-

12

sequently contains the same vice as the first, and needs no additional comment.

The third proposition commences with the recognition of what we regard as the fundamental and correct classification or division of the different character of the uses made of water of a running stream by riparian proprietors, and upon which depends the limit and interest to which the water may be diverted or consumed by the upper proprietors, without incurring responsibility to those below.

The uses of water, as said in the instruction, are natural or artificial, or as they may be termed, with equal if no more propriety, absolute or mechanical. In regard to the first, as we have already said, the right of the party into whose control the water comes (if not modified by prescriptive right, or special contract), is unconditional and complete. And if the water is *bona fide* and economically appropriated to such use, no one can complain, though the entire stream be consumed. In respect to mechanical and artificial uses of water, the rule is altogether different. For in respect to these, while a riparian owner may use the water as it flows, he cannot do so to the detriment of those above or below him. He can neither flow it back upon the one, nor divert it from the other, or render it impure or offensive. To which, then, of these two classifications of the use of water does its application to irrigation in the locality where it was so applied by appellant belong? It may possibly be true, as was said by the Supreme Court of Nevada, in the case to which we have referred, in England and those States of America where rain can be relied upon with sufficient certainty for the cultivation of the soil for all necessary and useful crops, that the weight of authority is against the use of the water of a running stream for irrigation, as a natural want or absolute right. But even this is by no means certainly the fact. And the decisions are unquestionably far from being uniformly that way. For, says the Supreme Court of Massachusetts : " The owner of land bordering on an ancient brook of running water has a right to divert or otherwise use it

" for the purpose of irrigating his land, provided he returns the
" surplus into the natural channels; and if the owner of the
" adjoining close below is injured thereby, it is *damnum*
" *absque injuria*, and no action lies therefore." (Martin *v.*
Alden, 8 Mass., 130.) And in Blanchard *v.* Baker, 8 Greenl.,
253, the right to use water for irrigation is put upon the same
ground as its use for watering cattle. See also Anthony *v.*
Lapham, 5 Peck., 175; and in Wadsworth *v.* Tillotson, 15
Conn., 366, it was held that water might be diverted for the
uses to which the owner of the land may lawfully apply it; and
though the surplus was not returned to the stream before it
reached the plaintiff's land, but was allowed to escape and irri-
gate defendant's land or waste, the plaintiff was not entitled to
a recovery, unless the defendant had used the water in an im-
proper or unreasonable manner. (Also Perkins *v.* Doro, 1
Root, 535; Leigh's Nisi Prius, 564, Section 10 *et seq.;* Leggins
*v.* Inge, 7 Bing., 692; Harwood *v.* Mason, 1 Root, 537.)

But even if it is true that the weight of authority in these
States where irrigation is of comparatively little practical use,
and where necessity does not recognize the appropriation of
water of a stream to this purpose as one of its natural uses, a
riparian proprietor has not the right thus to apply it, it does
not follow that in other localities, where the climate is alto-
gether dissimilar, and the occasion and necessity for its use in
this way is altogether different, that the rules and principles of
the common law will not justify and sustain its appropriation
in this way as an absolute or natural use of water, in which the
party so using it can be neither limited nor controlled by the
courts, except only in the *bona fide* and economical appro-
priation of it to this use.

For as is most justly and appropriately said by Mr. Justice
Bronson, in Starr *v.* Child, 20 Wend., 149, " Now I think no
" doctrine is better settled than that such portions of the law
" of England as are not adapted to our condition, form no
' part of the law of this State. This exception includes not
' only such laws as are inconsistent with the spirit of our insti-

" tutions, but such as are passed with special reference to the " physical condition of a country differing widely from our " own. It is contrary to the spirit of the common law itself, " to apply a rule founded on a particular reason, to a case " where that reason utterly fails ; *cessante ratione legis cessat* " *ipsa lex.*"

And the courts, in the interpretation and application of the law to the cases before them, are bound to take notice of the political, physical, and social condition of the country which they judicially rule. And upon this principle, as is well known to the court, the right to the exclusive appropriation and use of the entire water of a stream has been recognized and enforced in California, not only for irrigation, but also for purposes of mining, from the first settlement of the State. And immense sums have been expended to make available these uses of water, but for which a large portion of the great agricultural and mineral wealth of this Eldorado would be still undeveloped. Yet this was all done under the proper application of the rules of the common law to the rights and obligations of parties, because of the dissimilarity of its physical condition and climate from England, or the rich and fertile agricultural regions of our central and northern States. And in commenting upon this application of the common law in that State, it was very justly said by Mr. Justice Heydenfeldt : " That new conditions and new facts may produce a novel " application of a rule which has not been before applied in " like manner, does not make it any the less the common law ; " for the latter is a system of grand principles, founded on the " mature and perfected reason of centuries. It would have but " little claim to the admiration to which it is entitled, if it fail- " ed to adapt itself to any condition, however new, which may " arise, and it would be singularly lame, if it is impotent to " determine the right of any dispute whatever. Having, so far " as we have gone, met all difficulties by adhering to its doc- " trine, we have no ground to presume that we will have to go " beyond its precincts for a solution of any which may arise.'

(Cooper *v.* Weaver, 6 Cal., 555.)    And that these principles have been held sufficient to justify and sustain the diversion of water for purposes of recognized and general use, will be abundantly shown by reference to almost any volume of the reports of the Supreme Court of that State.    Out of the great number of cases to which we might refer, we cite Eddy *v.* Simpson, 3 Cal., 252; Hill *v.* Newman, 5 Cal., 445 ; Kelley *v.* Natuma Water Co., 6 Cal., 108; Crandall *v.* Woods, 8 Cal., 131 ; McDonald *v.* Bear River Co., 13 Cal., 220; Kidd *v.* Laird, 15 Cal., 179 ; Weaver *v.* Eureka Lake Co., 15 Cal., 273 ; McKinney *v.* Smith, 21 Cal., 374 ; Union Water Co. *v.* Crary, 25 Cal., 508 ; McDonald *v.* Askew, 29 Cal., 206 ; Nevada and Sacramento Canal Co. *v.* Kidd, 37 Cal., 310.

And a like rule has been recognized and established in Nevada, as will be seen by reference to the case of Gilsen *v.* Mason, 5 Neva., 283, and also Lobdell *v.* Simpson, previously cited.  Though, in this latter case, the judge who delivered the opinion, without the comprehensive knowledge and just appreciation of the common law of Judge Heydenfeldt, erroneously supposed, in following the California decisions, the court, under the constraint of a necessity which justified it, was departing in its judgment from the principles of the common law.

And upon the same construction of the law and the exclusive appropriation by one riparian proprietor, though the water may thereby be diverted from others below him on the stream, have great agricultural and mineral enterprises been built up, and large capital expended, and the productive resources of the country utilized and developed; likewise in Colorado, Utah, and the other territories along the slopes of our great mountain chain, of similar climatic conditions.

If the right to the use of water for irrigation had not been known to, and recognized as a fundamental proposition in our original land system and land grants, and subsequent legislation of the State, as well as former decisions of this court, would there be any just reason why our courts should not give application to the same principle here as has been done under

like circumstances elsewhere? The proof in the record, our daily experience and observation, demonstrate the public utility and necessity of irrigation, and show us that the beautiful language of the prophet is no less appropriate here than in the land of Assyria, when he says, " The waters made him great, " the deep set him up on high, with the rivers running round " about his plants, and sent out little rivers unto all the trees " of the field."

It is said, however, in the instructions, that the use of water for irrigation is not a natural right, unless it is absolutely necessary to use it in this way in order to raise sufficient food to support man. And in support of this proposition, we are referred to the case of Evans v. Merriweather, 3 Scam. (Ill.), 496. And though some general expressions of this sort are used argumentatively by the court in its opinion in that case, they certainly never could have been intended to be understood in the strict and absolute sense in which the doctrine is laid down in this case. If so, they amount to a denial of the natural use of water for any purpose, certainly so for irrigation, even in those instances in which it is unquestionably admitted to belong to this class. In all civilized, if not also in savage countries, habitation and population must precede irrigation. And if this right to the water depends solely upon the condition that it be exercised only to the extent which will support life, it is tantamount to its entire denial as an absolute or natural use of the water. And if this is the principle upon which the right to the use of water depends as a natural use, is it not also true that man can live without animal food, and therefore water for cattle is not one of the uses of water of this character? Or it must be limited on the theory of the charge to the watering of barely sufficient cattle to furnish food for one's family? And as to how many other purposes water is applied by civilized people, but without which life could be supported, we need not inquire.

The rule given to the jury by the court falls far short of furnishing a correct guide to determine whether the use of

water for irrigation is, or is not to be regarded as one of its natural uses, if, indeed, the court should not have so determined it as a matter of law, as was done by this court in Tolle v. Correth, 31 Texas, 362. It is no doubt true that the necessity for the use of water for certain purposes, enters, to some extent, at least, into the distinctions in the character of the uses of water recognized by the law, but this is in a relative, much more than an absolute sense. Certainly it is by no means common, if ever requisite, that the water of the particular stream in question is absolutely necessary as drink for one's family, or for household purposes, or even for the watering of his cattle; but the element of water is essential for these purposes, and so it is to the nourishment of plants and vegetables, and hence these are regarded as absolute or natural uses of it. And this classification and distinction in the uses of water grows out of the nature and character of the use made of it, and the fact that the common law furnishes no rules for determining or limiting its *bona fide* application and enjoyment for such purposes. Hence, as a general rule, all these uses of water for highly necessary and useful purposes, by which it is absolutely consumed in its use, and in the manner and extent of the use of which it is impracticable to discriminate, are placed with this class.

And, although there is no property in running water, and the owner of land upon a stream may use its waters in such manner and for all such purposes as his right as a riparian proprietor entitles him, if they are diverted or consumed by another for as high and legitimate purposes as the one he seeks to accomplish, he has no right to complain or interfere with their use by his neighbor, but must abide the disadvantage of the location of the land he has selected.

We submit that these considerations are sufficient to show that the court erred in defining the rule by which the jury were to be guided in determining whether the use made of the water by appellant was natural or artificial; and also in so much of the charge in this connection in which it was held,

that the *bona fide* and economical use of the water for irrigation, if a natural use, could be limited or controlled by the necessities of appellant for its use in this way to raise sufficient food for his family, or that this natural use of the water was subject to partition and division among the riparian proprietors.

The fourth proposition is, in effect, if irrigation is an artificial use of water, it is for this purpose the subject of partition between all the riparian proprietors, in proportion to their necessities for its use in this way for raising food for their families, servants, and domestic animals, says the court in its instructions to the jury; but according to the relative quantity of land susceptible of irrigation, owned by them respectively, as it holds in the judgment.

With due respect to the court and the learned counsel, we think this proposition may be answered by the mathematical formula of reduction to an impossibility. In the use of water for mechanical purposes, or such as are denominated as artificial uses, the rules of law are clear and well defined, and of easy application; but it is altogether different in respect to its natural uses, and, indeed, the attempt to apply to the uses of water of the latter character the rules applicable to the former would be tantamount to a denial of these rights to its use to all the riparian owners. For example, how can we imagine even a court of chancery, under the rules of the common law, could go about apportioning the amount of water of a running stream which might be consumed in watering the stock of the different proprietors? And any reasonable apportionment of it in respect to the irrigation of land must be almost as difficult. The soil of one requires more water than another.

Different crops require different quantities of water, and these requirements vary with the stage and seasons of their growth. One character of soil returns more water to the stream than another. The water is wanted by the different proprietors at different times, as they may differ in the crops they cultivate, or as they may differ in their judgment as to

the proper time and quantity of its application.   By one the
water to be used for the entire year may be needed in a few
weeks, another wishes to use the same quantity at intervals
throughout the entire year.   The crop of one proprietor might
be injured by irrigation, while his neighbor's is suffering for its
want.   The stream at one time supplies more water than at
others.   The volume of its water, when it passes the lands of
the different proprietors, greatly varies.   At some seasons this
is the case as we descend and at others as we ascend the stream.
Then, by what rule or principle is the court to be guided in
making its partition?   Shall it be in proportion to the quan-
tity of land owned by the parties, or the quantity susceptible
of irrigation, or such part of it as each may be accustomed to,
or wish to irrigate?   Shall it be among only those who, at
the date of the application, have used the water for this pur-
pose, or manifest a wish or desire to do so?   Or shall it be made
between those who come or are brought before the court?   Or
must all the riparian proprietors be before the court, and must
it be apportioned between them all?   If the parties own
equal quantities of land, and a like portion of it is susceptible
of irrigation, shall they have the same quantity of water, or
shall their respective shares be varied by the length or distance
of the stream passing by or through their lands?   What effect
shall the fact that the land of the one which may be irrigated
is below where the stream leaves his land and that of the other
is above it?   That in one case the surplus water passes back
to the stream, or on to the land of his neighbor, and in another
it does neither?   Or shall the rule for its partition depend
upon the necessities of the parties, the number of their
families, servants, and domestic animals, as held in the instruc-
tions of the court?   And what distinction, if any, is to be
made on account of the different nature and character of their
several necessities?   What effect shall the ever-varying and
changing condition and necessities of the parties, the differ-
ence in the quantity of land, irrigable or otherwise, different
frontage upon the stream, have upon their rights after the par-

tition has once been made? Is it to be like the laws of the
Medes and Persians, or subject to change and modification? if
the latter, when and how, and upon what principles are the
changes and modifications to be made? Does land entitled to
its share of the water lose the benefit of this hereditament,
because by sale or partition it has been separated from the
stream? Indeed, an endless variety of circumstances may be
imagined, under which any attempt on the part of the court to
partition and regulate by injunction the proportion of the
volume of a fluctuating and varying stream of running water,
which may be used by the different riparian proprietors, must
result in contradictions and absurdities. And if practicable
effect could be given to the effort to make such partition, no
substantial individual benefit would be attained, but great
public detriment must inevitably result; if, indeed, the judi-
cial sanction of such a principle would not render nugatory
and valueless to all parties the right to use the water for irri-
gation, as most certainly would be the case on all small streams,
where the diversion of a sufficient quantity for any practicable
purpose would cause a material diminution of the volume of
the stream. And we submit that there is no middle ground
which the court can occupy, but it must either be held that a
riparian owner may use the water passing by or over his land
in an economical manner, for the *bona fide* purpose of irriga-
tion, without reference to the quantity consumed, or that it is
the right of each riparian owner to have the stream flow with
its accustomed volume, without material or perceptible diminu-
tion or diversion by those above him for irrigation, whether he
can, or desires to make a similar use of it or not, or whatever
may be the extent of his riparian ownership. That public
interest would be promoted, or that the law demands the latter
conclusion we cannot believe.

*Terrell & Walker*, for the appellee. The court is asked to
make a rule, supposed to be adapted to Texas, her soil, climate,
and population, to develop her inert grain-growing forces.

The court is pressed to assume a knowledge of the physical wants of Texas agriculture, and to revise the common law rules as to the rights attached to the ownership of land. In other irrigation countries the ownership in the water of rivers has been claimed by the sovereignty, and water rights given by express grant. So the irrigable lands in Texas—so the lease of water from public canals and reservoirs in Lombardy and British India. But at common law the riparian proprietors own the stream subject to the easement of the public. (Ang., Sections 6 and 8.)

But what will the Texas courts take for the model stream from which to determine the new rule? Will this prerogative, when exercised, adapt the rule (for it must be general) to the Trinity, with its fogs and swamps, its floods and malaria; or to the Pecos, Nile-like, winding its desert course without springs or tributary—waiting the dam and ditch, the windmill and engine, to make a second Egypt?

Rather, will not the facts of each case furnish the basis of judicial action in this as in other legal controversies?

The facts in San Saba county do not call for such new rule, nor for revoking the maxims of antiquity.

Among California miners squatted upon public lands, the courts presumed a license to dig and wash out the precious metals, and gave the first occupant a vested right in the water and the mine. (Irwin v. Philips, 5 Cal., 146; Conger v. Weaver, 6 Cal., 555.)

Further than this, it is believed that neither California nor Nevada have gone. When lands as such were patented by the United States Government, the old rules were followed; and ownership of land even there carried with it the water flow. (Lobdell v. Simpson, 2 Nev., 276 and 277; Hill v. Neuman, 5 Cal., 446; Merced M. Co. v. Fremont, 7 Cal., 325; Crandell v. Woods, 8 Cal., 144.) In this last case, the leading case of 12 Wend., 330, Arnold v. Foote, is cited with approval—a case in its points very much like the case at bar.

The flexible construction of the common law given by

Justice Heydenfeldt, in Cooper *v.* Weaver, 6 Cal., 555, so elabo-rately cited by appellee, strikes us as new and dangerous. The court in that case seemed to regard the common law as composed of rules, some of which were suspended in *nubibus*, and un-known until new phases of society required their exercise, when straightway they are invoked, to change the law as it was, and the new rule, christened as common law, becomes the subject of panegyric as "part of a system of grand principles." Un-der such a construction, the common law would no longer be a system of fixed principles and rules, but in its gum-elastic tex-ture would become flexible as the caprice of man—and he who would understand it must study, not the rule, but the demands of interest and convenience in the shifting phases of society. Yet upon such a doctrine our adversary must rely, to avoid the force of a fixed rule upon which the judgment in the court below was based. The courts of Nevada in Gillen *v.* Mason, in following the decision of Cooper *v.* Weaver, had at least the boldness to avow that they departed from the common law.

But the common law giving the rule furnishes the exception, and it seems to be exhaustive of the subject.

In Evans *v.* Merriweather, 3 Scam., 496, the relative im-portance of the various uses of water has been discussed.

Its reasoning can well apply to the Simpson Creek lands. It was not "indispensable to the cultivation of the soil"—it is not essential to existence that irrigation be used. All the parties could live if the water of the creek was not used for irrigation.

By irrigation, Fleming might increase the products of his fields. He could add to his gains and multiply his luxuries. He could acquire wealth more easily than his neighbors. But was it necessary that he should do so? The reasoning of this case is conclusive against the defendant, and the instructions embracing the principles of this case were properly given.

We show that the common law, both by its rules and excep-tions, ignore the claim of defendant to the exclusive irrigation rights in the stream.

We claim the rights given to plaintiff by the law, and we

question the right of courts to disregard the established principles and maxims of the common law. It is a statutory rule, and discretion does not exist. (De Leon v. Owen, 3 Texas, 153; Courand v. Vollmer, 31 Texas, 399; Barret v. Kelly, 31 Texas, 481; Dailey v. Monday, 32 Texas, 142; Diamond v. Harris, 33 Texas, 637.)

In this last case the court, in terms, recognizes this necessity upon it, Walker, Justice, expressing the obligation: "It is dif-"ficult for us to see how the courts of this State are to ignore "the common law as a rule of decision when it is made so by "statute."

The distinction between the necessary use of water on the one part, and the mechanical or speculative use and gain on the other, while easily perceived, will not admit of exact definition. Water is necessary to the culture and growth of plants and grain, and, when not supplied by rain in quantities and regularity to meet the wants of vegetation sufficient for the support of man—and when, by artificial means, the want can be supplied—when such artificial aid is requisite to render agriculture a source of supply for food, then, as food is necessary, the means to provide it becomes so, and irrigation becomes a necessity, and such use is to supply natural wants. In such cases there is no law or limit to its use.

But we have no such country in San Saba county. Uplands afford wheat and corn in good crops without artificial aid; the valleys are better, and increased only one-third by irrigation. But a small proportion of the population can have any water for their fields, save as supplied by the rains of heaven. When the gains from irrigation can be counted and measured—compared with the natural culture of the fields—when successful agriculture is possible without it, with it advantageous—when the gains from irrigation become wealth, an object of computation—then, to claim it to the exclusion of the lower proprietor, is to work him an injury without the plea of necessity, and such claim enforced becomes unlawful, and gives plaintiff the right to recover.

Here irrigation is measured in the increased profits; it is demanded by love of gain, not by necessity. Its object is not to convert a desert to a fertile field, but to increase the fertility of an already fruitful soil. The defendant pleads necessity that his gains from labor be more ample and his income more certain.

It was proper for the court to make the partition, which, to some extent, has been decreed in enjoining Fleming from using more than three-sevenths of the water which can be taken from the stream for irrigation purposes.

But upon the question of partition we cannot reply to the very ingenious argument of appellant; but we can point to the history of irrigation elsewhere, and show that in every other irrigation enterprise, some mode of division of the water obtians.

In Mexico, where there is insufficient water to supply the irrigation rights, the rule is given: " In such cases, that which " appears to be more just and equitable is to disregard the " respective antiquity of the grants, and, considering them " equal, to proceed to make a pro-rata division, either by days " or by nights, or by days by turn, so that the profit and loss " shall remain equally divided among all." (Ordenanzas de Tierras y Aquas, Section 2, p. 138, a work said to be authority in the Mexican courts.)

In northern Italy, where irrigation has been practiced for over seven centuries, and where the subject appears to have become an important part of the law, the subject of scientific investigation and of many treatises, the " measurement of " water " is reduced to something like scientific accuracy. Yet there are many systems of measurement. A common method of measurement of water in Piedmont and Lombardy, is by horary rotation. The period of rotation is fixed, often at eight days, and the hours divided within which each has the exclusive use of the water. Each has it in turn for his number of hours, passing the entire circuit every eight days. (See Vol. II., p. 67, Italian Irrigation.)

There are three methods of distribution in common use:

1st. " Distribution according to the use of the water."  *  *
2d. " Has reference to the time for which the water is granted."
3d. " Has reference to the quantity of water distributed.  (2
" Italian Ir., 281.)"

In case of disputes, aid is had from "professional men,"
(experts,) "nominated by the parties, or by the tribunals, if
" the case is carried before them."  (Ib., 284.)

In British India, the government has repaired the old canals
and tanks, and constructed new ones, of wonderful magnitude.
(See Irrigation of the Madras Provinces.)  A system of irriga-
tion is fostered, at once a source of wealth to the population
and to the government, the water rents paying a large per
cent. on the costs of construction.  (Ib., 147.)  There " the
" want of water brings with it abject poverty and discontent;
" its abundance, wealth and contentment."  (Ib., 147.)  The
very existence of water rents assume measurements of some
kind, determining the quantity upon which the rent is to be
paid.  These rents are levied, 1st. " On the area of the open-
" ing of the irrigation outlet at a certain rate."  2d. " On the
" area of the land irrigated."  (App. to Ib. Ir., 318.)

In California, the water in artificial channels will be parti-
tioned.  (Kidd v. Laird, 15 Cal., 179.)  Courts will entertain
and adjust disputes as to the quantity of water used by parties
having right to use from a ditch.  (11 Cal., 153.)  Nor will
its difficulty be an obstacle to the court taking jurisdiction.

In San Antonio, in this State, the irrigation rights are ascer-
tained.  Each has his hour to let the water run upon his
premises.

So elsewhere, courts aid in adjusting such disputes (Paulett
v. Cook, 44 N. H., 517), taking means to ascertain between
mill owners their rights, and divide the water accordingly.

In Tyler v. Wilkinson, 4 Mason, 413, between mill owners,
the principles adjusting disputes of persons having water
rights were considered, and the case " referred to a master to
" ascertain, as near as may be  *  *  *  the quantity to
" which the trench owners are entitled, and to report a suitable

" mode and arrangement permanently to regulate and adjust " the flow of the water so as to preserve the rights of all parties."

In Bliss· v. Kennedy, 43 Ill., 76, a dispute between manufactories for water for steam, the principles governing the right and the rule for division of the water of a stream insufficient for the wants of both were discussed and stated. It is to be divided between them, as nearly as may be, according to their respective requirements, * * * even " while the " water is incapable of being thus divided with mathematical " exactness," etc. (Angell on Watercourses, Section 447.)

Here we have in the water of Simpson Creek a source of wealth. Hydraulic agriculture can be pursued, not from necessity, but for gain and increase of wealth of the neighborhood. The owners of this property, and who have an equality of right therein, are all before the court. There are no facts showing Fleming's greater wants for the use of this property than the others.

The lands susceptible of irrigation are known, so the capacity of the stream. These are data sufficient to ascertain the rights of the parties.

All are claiming the right to use this water ; all, save defendant Fleming, agree to a division of it. The facts give the basis of determining his relative rights as against the lower proprietors.

WALKER, J. This suit involves a controversy between the riparian owners of the land on and through which a stream known as Simpson's Creek in San Saba county rises and flows. The county of San Saba is about ninety miles north-west of the city of Austin, and in what is generally known as the western part of the State. The lands owned by the parties are located within the boundaries of Fisher and Miller's Colony.

One Sherwood appears to have been the first locator ; but in 1859 this court declared his location void, and the lands were re-patented to Fleming. In 1856 or 1857, M. Hubert and H. Taylor settled on Simpson's Creek, and subsequently pur-

chased lands from Fleming. Davis was a purchaser under Sherwood. As early as 1857, one McNeal, who appears to have been a squatter without title to any of the land, used a portion of the water from the headspring of Simpson's Creek, for the purpose of irrigation. In 1866, Fleming acquired possession of McNeal's improvement. The stream appears to be about three miles long, rising in springs on Fleming's land, and emptying into the San Saba river. After the failure of Sherwood's title, Davis purchased from Fleming. Hubert's lands were divided among his children. Marley purchased from Davis; and Brown and Taylor became the owners of the Henry Taylor tract. Thus stand the parties before the court.

The stream appears to have supplied the ordinary and necessary wants of the land owners for several years, without becoming a subject of contention. Gardens and small fields were irrigated from its waters. But it is said that when Fleming purchased the headspring in 1866, he made more extensive improvements, and claimed the exclusive right to the use of the water for irrigation purposes.

In September, 1868, Davis, whose administratrix now represents him, brought this suit, claiming damages for the wrongful diversion and waste of the water. The appellant claims the exclusive right to the water of the stream, for irrigation purposes. The other parties to the suit are intervenors, who claim a right to a partition of the water, for the purposes of irrigation. We do not propose in this opinion to discuss the errors assigned, otherwise than incidentally, and for the purpose of our opinion we shall not specially call in question the instructions of the District Court to the jury.

It is contended that public necessity now requires that the rule of law which should govern all such cases should be clearly and distinctly announced by this court, and that the case at bar presents all the necessary facts to render this duty imperative. We do not recognize any exclusive right by purchase or by prior occupation, in any of the parties to this suit. The legal and equitable rights of the parties may be regarded as equal,

13

so far as purchase or occupation gives rise to such rights.  The case of Tolle *v.* Correth, 31 Texas, 362, recognizes a right to the use of water for purposes of irrigation, growing out of the colonization and land laws of the Republic and State.  Were it not for the concluding paragraph in the opinion of the Chief Justice, we could apply to this case for an authority on which the case at bar might be decided.  The court say :
" Where the defendant owned the land upon which there was
" a spring, he had the right to use the water for the purposes of
" irrigation, provided he restored it back to its natural channel
" before it reached the lands of the adjoining proprietor ; and
" if the stream was thus weakened so as to damage the adjoin-
" ing proprietor, the defendant was not liable for such damages."

If this be the true doctrine, then the owner of the headsprings of a stream would appear to have an exclusive right to use the water to irrigate his land, to the extent of weakening the stream and damaging the adjoining proprietor, provided he restored the stream to its natural channel before it reached the lands of the adjoining proprietor.  But suppose the owner of the spring should weaken the stream flowing from it to exhaustion, how, then, could he restore it to its natural channel before reaching the lands of the adjoining proprietor ?   The closing paragraph of the opinion reads thus :

" We would not be understood as deciding to what extent a
" stream can be used for irrigating purposes.  The relative
" rights or exclusive rights are not before us."

What, then, is decided in this case ?   If anything, it is decided that the owner of the headspring may irrigate his land with the water of the stream until he weakens it and damages the adjoining proprietor, and yet not be liable in damages, if he can only restore the stream back into its natural channel before it reaches the lands of the injured proprietor.  This is physically impossible, and the case furnishes no rule of decision.

Let us look to the common law.  A most orthodox authority reads thus :

" Every proprietor of lands on the banks of a river has natu-

" rally an equal right to the use of the water which flows in
" the stream adjacent to his lands, as it was wont to run (*cur-*
" *rere solebat*), without diminution or alteration. No propri-
" etor has a right to use the water to the prejudice of other
" proprietors above or below him, unless he has a prior right to
" divert it, or a title to some exclusive enjoyment. He has no
" property in the water itself, but a simple usufruct while it
" passes along. *Aqua currit, et debet currere ut currere*
" *solebat*, is the language of the law. Though he may use the
" water while it runs over his land, as an incident to the land,
" he cannot unreasonably detain it, or give it another direction,
" and he must return it to its ordinary channel when it leaves
" his estate. Without the consent of the adjoining proprietors
" he cannot divert or diminish the quantity of water which
" would otherwise descend to the proprietors below, nor throw
" the water back upon the proprietors above, without a grant or
" an uninterrupted enjoyment of twenty years, which is evi-
" dence of it.

" This is the clear and settled general doctrine on the sub-
" ject, and all the difficulty which arises consists in the appli-
" cation. The owner must so use and apply the water as to
" work no material injury or annoyance to his neighbor below
" him, who has an equal right to the subsequent use of the
" same water; nor can he, by dams or any obstruction, cause
" the water injuriously to overflow the grounds and springs of
" a neighbor above him.

" Streams of water are intended for the use and comfort of
" man; and it would be unreasonable, and contrary to the uni-
" versal sense of mankind, to debar every riparian proprietor
" from the application of the water to domestic, agricultural,
" and manufacturing purposes, provided the use of it be made
" under the limitations which have been mentioned; and there
" will, no doubt, inevitably be, in the exercise of a perfect
" right to the use of the water, some evaporation and decrease
" of it, and some variations in the weight and velocity of the
" current. But *de minimis non curat lex*, and a right of action

" by the proprietor below would not necessarily flow from
" such consequences, but would depend upon the nature and
" extent of the complaint or injury, and the manner of using
" the water.

" All that the law requires of the party by or over whose
" land a stream passes, is, that he should use the water in a
" reasonable manner, and so as not to destroy or render useless,
" or materially diminish or affect the application of the water
" by the proprietors above or below on the stream. He must
" not shut the gates of his dams, and detain the water unreason-
" ably, or let it off in unusual quantities, to the annoyance of
" his neighbor. Pothier lays down the rule very strictly, that
" the owner of the upper stream must not raise the water by
" dams, so as to make it fall with more abundance and rapidity
" than it would naturally do, and injure the proprietor below.
" But this rule must not be construed literally, for that would
" be to deny all valuable use of the water to the riparian pro-
" prietors. It must be subjected to the qualifications which
" have been mentioned, otherwise rivers and streams of water
" would become utterly useless, either for manufacturing or
" agricultural purposes. The just and equitable principle is
" given in the Roman law: *Sic enim debere quem meliorem*
" *agrum suum facere, ne vicini deteriorem faciat.*" (3 Kent,
pp. 561–565.)

This is the rule of the common law; but it has not been
everywhere recognized as applicable to the wants and condition
of the people, and a maxim of the common law, *cessante ratione
legis, cessat ipsa lex,* is cited to defeat the application of the
rule in this State.

That certain portions of the State of Texas are subject to
periodical drouth, and that the growth of vegetation would be
greatly improved by the artificial application of water, are well
understood facts; but whilst irrigation may be recommended
by economy, must it be regarded as a thing of necessity? If
so, does the necessity exist throughout the State? If not, must
we lay down a rule predicated upon supposed public necessity,

1872-3.]        F<span style="font-variant:small-caps">leming</span> v. D<span style="font-variant:small-caps">avis</span>.        197

which is to apply only to certain portions of the State, for the reason that it could not find its predicate elsewhere ?

In Arnold v. Foot, 12 Wendell, the learned Savage, C. J., delivering the opinion of the court, it was decided that where a spring of water rises upon the land of one owner, and from it runs a stream on the land of another, the owner of the land upon which is the spring has no right to divert the stream from its natural channel, although the waters of the stream are not more than sufficient for his domestic uses, for his cattle, and for the irrigation of his land. The Chief Justice also quotes from the opinion of Mr. Justice Story, 4 Mason, 400 : " The " natural stream existing by the bounty of providence, for the " benefit of the land through which it flows, is an incident " annexed to the land itself."

" Each riparian proprietor is bound to make such a use of " running water, as to do as little injury to those below him, as " is consistent with a valuable benefit to himself. The use " must be a reasonable one. Now, the question fairly arises, " is that a reasonable use of running water by the upper pro- " prietor, by which the fluid itself is entirely consumed ? To " answer this question satisfactorily, it is proper to consider the " wants of man in regard to the element of water. These " wants are either natural or artificial. Natural are such as are " absolutely necessary to be supplied, in order to his existence. " Artificial, such only, as by supplying them, his comfort and " prosperity are increased. To quench thirst, and for house- " hold purposes, water is absolutely indispensable. In civilized " life, water for cattle is also necessary. These wants must be " supplied, or both man and beast will perish.

" The supply of man's artificial wants is not essential to his " existence ; it is not indispensable ; he could live if water was " not employed in irrigating lands, or in propelling his machin- " ery. In countries differently situated from ours, with a hot " and arid climate, water doubtless is absolutely indispensable " to the cultivation of the soil, and in them, water for irriga- " tion would be a natural want. Here it might increase the

" products of the soil, but it is by no means essential, and can-
" not therefore be considered a natural want of man. So of
" manufactures, they promote the prosperity and comfort of
" mankind, but cannot be considered absolutely necessary to his
" existence; nor need the machinery which he employs be set
" in motion by steam.

" From these premises would result this conclusion, that an
" individual owning a spring on his land, from which water
" flows in a current through his neighbor's land, would have
" the right to use the whole of it, if necessary to satisfy his
" natural wants. He may consume all the water for his domes-
" tic purposes, including water for his stock. If he desires to
" use it for irrigation or manufactures, and if there be a lower
" proprietor to whom its use is essential to supply his natural
" wants, or for his stock, he must use the water so as to leave
" enough for such lower proprietor. Where the stream is small,
" and does not supply water more than sufficient to answer the
" natural wants of the different proprietors living on it, none
" of the proprietors can use the water for either irrigation or
" manufactures. So far, then, as natural wants are concerned,
" there is no difficulty in furnishing a rule by which riparian
" proprietors may use flowing water to supply such natural
" wants. Each proprietor in his turn may, if necessary, con-
" sume all the water for these purposes. But where the water
" is not wanted to supply natural wants, and there is not suffi-
" cient for each proprietor living on the stream, to carry on his
" manufacturing purposes, how shall the water be divided ?
" We have seen that without a contract or grant, neither has a
" right to use all the water; all have a right to participate in
" its benefits. Where all have a right to participate in a com-
" mon benefit, and none can have an exclusive enjoyment, no
" rule, from the very nature of the case, can be laid down as to
" how much each may use without infringing upon the rights
" of others. In such cases, the question must be left to the
" judgment of the jury, whether the party complained of has
" used, under all the circumstances, more than his just propor-

" tion."    Such is the reasoning of the able opinion of the Supreme Court of Illinois, Evans v. Merriweather, 3 Scammon, pages 495–497.

We are not certain that the country through which Simpson's Creek flows, is so anomalous in its character as to require either legislative or judicial departure from the rules laid down by these able common law authorities, and as shown by the extract from Kent.    There is no material difference between the common law rule and that of the Roman and French law.    In the learned and able argument of appellee's counsel, we are referred to the customs of the Lombards, French, Italians, etc. We have not access to the laws of these people; but we know something of their history in this behalf.    Not only in the countries mentioned, but in all the Spanish provinces, in French and British India, and in Mexico, the subject of irrigation is taken under direct government control.    The irrigation canals are constructed at the public expense, much upon the principle that our large cities are supplied with water through the public reservoirs and hydrants, those who use the water paying a tax or assessment for the purpose of meeting expenses.    Such works are sometimes constructed under a corporate franchise, by private capital.

We believe that in our own State where irrigation is carried on to any extent, as at the city of San Antonio and its vicinity, and at El Paso, the local authorities have charge of the canals, and the water is used by private subscription, or in some cases it may have become a corporeal hereditament where it runs upon the land of the user, or an incorporeal hereditament where it passes over the lands of another.    We know not under what system of laws or customs the canals at El Paso were constructed and used; they were found in existence and use by the earliest Spanish explorers, showing that they were built and used by a people who have left but few monuments of civilization behind them.    The Spanish missionaries in Mexico, Texas, and California, it is said, in the construction of these canals, imitated the engineering of the Aztecs; however, this may be

true or not. No law has been handed down to us which can throw a single ray of light upon the question now before us. The very able counsel who represent both sides of this case furnish us a learned expose of the common law. On the one side it is admitted that the common law decisions of other States, and of England, are not applicable to the condition of Texas, and it is claimed that a rule should be laid down applicable to the wants of our people. What Mr. Justice Bronson said in Starr v. Child, 20 Wend., 149, may have its weight in every proper case; for it is wisely said by a great man. Such portions of the law of England as are not adapted to our condition certainly form no part of the law of this State. We never dreamed of a law of primogeniture. We eschew entails. There are very many of the peculiarities of British law which have no adaptation to our system ; but when we come to questions purely of the common law, for the decision of which our own courts have prescribed no principle, then we are expressly directed to go to the common law of England for a rule of decision.

The concluding paragraph of the brief for appellee virtually admits that we are, in this case, at sea without chart or compass. The paragraph reads thus : " Upon the determination of " the rule by which a division of this water should be made, " although there may not be exact certainty of measurement, " yet with the many examples Texas ingenuity will not be at " fault." We confess we have not yet found the " examples," nor can we discover any precedent, for the partition of a stream of water, other than that fixed by the rules of the common law already stated in this opinion.

We have heard of the glorious uncertainty of the law ; but always regarded the " uncertainty " as a slander. The law has its certain rules, which, although not mathematically, are morally exact. This court meet with many difficulties in arriving at the moral exactitude attainable, but, we apprehend, were we to attempt judicial legislation on this subject, we should find ourselves much more at fault than we now are, acting under long and well-settled principles.

Mr. Angell in his work on water-courses has very ably treated this subject, giving prominence to the opinions of able jurists who have decided the question. The case of Cary v. Daniéls, 8 Metcalf, 466, and also the case of Hart v. Evans, are referred to on page 99 as sustaining Johnson v. Jordan, 2 Metcalf, 239. In this case Shaw, C. J., remarks: "Every person through "whose land a natural water-course runs, has a right, *publici* "*juris*, to the benefit of it as it passes through his land, for "all the useful purposes to which it may be applied; and no "proprietor of land on the same water-course, either above or "below, has a right unreasonably to divert it from flowing into "his premises, or obstruct it in passing from them, or to cor- "rupt or destroy it. It is inseparably annexed to the soil, and "passes with it, not as an easement, nor as an appurtenance, "but as parcel. Use does not create it, disuse cannot destroy "or suspend it. Unity of title and of possession in such land with "the lands above or below it does not extinguish or suspend it." This doctrine is founded on the well-known maxim, *sic utere tuo ut alienum non lædas.* We adopt this maxim as the rule for our decision in this case. It is explained clearly by the able authorities we have quoted. It appearing to this court that Fleming has asserted a right to which he is not entitled, and that the damages awarded to Mrs. Davis, being in the sum of seventy-five dollars, are not unreasonable for the trespass against her rights as a riparian proprietor in the ordinary use of the water, the judgment of this court will be that she have her judgment for the sum of seventy-five dollars, together with interest and costs, against Fleming; and that the intervenors pay the costs of intervention, and their petitions be dismissed.

It may not be improper, as the honorable Legislature is now in session, that we call attention to the subject-matter of this suit; that if, in the wisdom of that body, legislation be required to adapt the law to the peculiar wants of any portion of our State, appropriate action may be had at an early day. It can scarcely be doubted that the wealth and comfort of our people throughout a large portion of the State might be greatly aug-

mented by wise legislation on this subject. Our sister State of California found it necessary, at an early day, to legislate for the protection of her mining and agricultural interests. The decisions of her courts are not applicable to the case at bar. They are mostly made upon the statutes of the State, and touching rights which had grown up among her people, who were merely occupying tenants, or rather squatters, upon government land.

Reversed and rendered.