In re the **ADJUDICATION OF THE WATER RIGHTS OF the UPPER GUADALUPE SEGMENT OF the GUADALUPE RIVER BASIN.**

No. C–770.

Supreme Court of Texas.

Nov. 24, 1982.

Rehearing Denied Dec. 31, 1982.

Darrell G. Lochte, Wallace & Jackson, Kerrville, Hooper, Robinson & Moeller, Elbert Hooper, Henry & Lowerre, Richard Lowerre, Austin, for petitioner.

Mark White, Atty. Gen., R. Lambeth Townsend and Timothy Brown, Asst. Attys. Gen., Austin, for respondent.

POPE, Justice.

This is an appeal from an adjudication of the water rights along the Upper Guadalupe River. The Texas Water Rights Commission, acting under the Water Adjudication Act of 1967, determined the water rights of owners of 208 separate tracts of land that border the Upper Guadalupe River. Nineteen parties excepted, and, after hearing additional evidence, the 57th District Court made final the adjudication. The judgment fully recognized the riparian right to domestic and livestock uses; it recognized no riparian rights for lands granted after July 1, 1895; it recognized the riparian right to water used for irrigation but limited the right to the extent of the actual use during any year of the statutory test period from 1963 to 1967. The court of civil appeals affirmed the judgment of the trial court. 625 S.W.2d 353. We granted the writ of error because the decision in this case conflicts in some respects with the decision of the court of appeals in the case of *Schero v. Texas Dept. of Water Resources,* 630 S.W.2d 516 (Tex. App.—Waco, 1982), which is also decided today. Common to both appeals are several constitutional attacks upon the validity of the Water Adjudication Act. We affirm the judgments of the courts below in this case.

Water law in Texas was in a chaotic state prior to the enactment of the Water Rights Adjudication Act in 1967. Tex.Water Code Ann. §§ 5.301–5.341. Texas recognized both the law of riparian rights and also the law of appropriation of waters. Texas judicially adopted the riparian rights system, at least by 1856. *Haas v. Choussard,* 17 Tex. 588 (1856); *see also Fleming v. Davis,* 37 Tex. 173, 201 (1872). During the same general period of time, however, the Texas Legislature treated the ordinary flow of rivers, including that of the Guadalupe, as waters that the State could legislatively appropriate.[1] In 1852 the Texas Legisla-

---

1. Professor A.W. Walker, Jr. has collected some of the legislative acts in his *Legal History of the Riparian Right of Irrigation in Texas* *Since 1836,* Proceedings, Water Law Conference, University of Texas 41, 47 (1959):

ture, by enacting its first irrigation law, authorized county courts to regulate dams and the distribution of shares of water. 1852 Tex.Gen.Laws, ch. 74, at 80, 3 H. Gammel, Laws of Texas 958 (1898).

Following the severe drought that began in the summer of 1883, Governor Lawrence S. Ross called on the 21st Legislature to adopt for Texas the appropriation system of water rights.[2] The legislature responded enacting The Irrigation Act of 1889, 1889 Tex.Gen.Laws, ch. 88, at 100, 9 H. Gammel, Laws of Texas 1128 (1898). Governor Culberson called on the 24th Legislature six years later to preserve the State's storm waters for beneficial use, and that resulted in the enactment of the Irrigation Act of 1895. 1895 Tex.Gen.Laws, ch. 21, at 21, 10 H. Gammel, Laws of Texas 751 (1898). The acts declared that the unappropriated waters of streams in the arid parts of the State were the property of the public, but provided that the rights of riparian owners were not prejudiced.

Those two acts launched Texas upon its dual system of water rights. The State today makes appropriations of (1) its flood waters, *Motl v. Boyd,* 116 Tex. 82, 286 S.W. 458 (1926), (2) the waters in streams riparian to lands previously granted by Spain and Mexico, *State v. Valmont Plantations,* 346 S.W.2d 853 (Tex.Civ.App.—San Antonio 1961), *opinion adopted,* 163 Tex. 381, 355 S.W.2d 502 (1962), and (3) the ordinary flow

and underflow of streams riparian to lands granted after July 1, 1895, Tex.Water Code Ann. § 11.001(b). It distributes those waters for beneficial use by the issuance of permits.

The acts of 1889 and 1895 generated an entirely new problem. They authorized the use of state waters by those who filed in the offices of the county clerks affidavits describing the amount of water claimed and where it would be used. 1889 Tex.Gen. Laws, ch. 88, § 5, at 101, 9 H. Gammel, Laws of Texas 1128 (1898); 1895 Tex.Gen. Laws, ch. 21, § 6, at 22, 10 H. Gammel, Laws of Texas 751 (1898). The filings, called certified filings, actually magnified the problems, because paper appropriations exceeded the capacity of the streams. Furthermore, "less than one-fourth of the total appropriated quantity was put to consumptive use." Rollins, *The Need For a Water Inventory in Texas,* Proceedings, Water Law Conference, University of Texas, 67, 68 (1952).

The droughts in 1910 and 1917 prompted the citizens of Texas to adopt the "Conservation Amendment" to the Texas Constitution, mandating the conservation of public waters. Tex.Const. art. XVI, § 59. The Legislature also enacted the Irrigation Act of 1917. 1917 Tex.Gen.Laws, ch. 88, at 211. That act authorized the Board of Water Engineers to make determinations of conflicting water rights, but in 1921 this court

---

By a special act of October 1, 1866 (5 Gammel's, *Laws,* 1284), the Guadalupe Water Company was incorporated with the power to construct a dam across the Guadalupe river for the purpose of irrigation and for motive power for machinery, *and with the right to divert from the channel of the river three-fourths of all the water in the river.*

By a special act of October 20, 1866 (5 Gammel's, *Laws,* 1360), the San Marcos Irrigation, Manufacturing and Navigation Company was incorporated with the power to construct a dam across the San Marcos river and with the *right to divert from the channel of the river two-thirds of all the water in the river for purposes of irrigation and motive power for machinery.*

By a special act of November 6, 1886 (5 Gammel's, *Laws,* 1491), the El Paso Irrigation and Manufacturing Company was incorporated with authority to construct a dam on the Rio Grande river and *to divert from its*

channel one-fourth of all the water forming said river for purposes of irrigation and motive power.

\* \* \* \* \* \*

By a special act of April 19, 1879 (9 Gammel's, *Laws,* 14), the Austin Canal, Irrigation and Manufacturing Company, which had been previously incorporated under the general corporation law of the State, was granted the right to construct a dam across the Colorado river above the City of Austin and *to divert so much of the water of the river as it might need for irrigation purposes.* [Emphasis added.]

2. Biennial Message from Governor Ross, Tex. H.R.J. 13, 24 (1889); *see* Walker, *Legal History of the Riparian Right of Irrigation in Texas Since 1836,* Proceedings, Water Law Conference, University of Texas (1959) 41, at 51.

held the adjudicatory powers of the Board unconstitutional as an invasion by the executive branch upon the judicial branch of government. *Board of Water Engineers v. McKnight,* 111 Tex. 82, 229 S.W. 301 (1921). The Texas Legislature in 1953 again created a forum for the adjudication of the massive confusion about claims to water rights. 1953 Tex.Gen.Laws, ch. 357, at 874. Again, the legislation failed because of its provision for a hybrid method of review that inconsistently authorized both a factual de novo review as well as a legal substantial evidence review. *Southern Canal Co. v. State Board of Water Engineers,* 159 Tex. 227, 318 S.W.2d 619 (1958).

*McKnight* ushered in a half century interregnum during which there was no inventory of available water and no record of the extent of claims upon the dwindling supply. The appropriators did not know the extent of their claims vis-a-vis other appropriators; riparian claimants did not know their rights vis-a-vis other riparians; and appropriators and riparians did not know their rights vis-a-vis each other. The problem was that the concepts basic to the two systems were hostile to each other. The appropriative system is based upon the beneficial consumption or use of water, while the riparian system is based on an ongoing right to an undetermined amount of future use to the falsely assumed undiminished flow of Texas streams. The appropriation system quantifies both the available waters and the amount of the authorized beneficial uses. Permittees use or lose their rights. Riparians on the other hand assert that their unquantified rights, though unexercised, continue indefinitely to the undiminished flow of streams that periodically ranges between flood levels to long periods of slight flow or no flow at all.

The judiciary has tried to reconcile the conflicts between the two systems. This court held in 1905 that the riparian doctrine, like the appropriation system, permitted irrigation. *Watkins Land Co. v. Clements,* 98 Tex. 578, 86 S.W. 733 (1905). The Supreme Court in 1926 undertook to divide the waters between riparians and appropriators, so that riparians would get the ordinary flow and underflow of streams; appropriators would get the flood waters. *Motl v. Boyd,* 116 Tex. 82, 286 S.W. 458 (1926). The line was amorphous, and engineers and hydrologists had problems determining the ordinary flow of a stream that flowed only when it rained. Mean flow, average flow, and ordinary flow are measures that have not been judicially addressed. *Motl* also generated a new problem by its dicta that Spain and Mexico also recognized the riparian system. The error was corrected in *State v. Valmont Plantations,* 346 S.W.2d 853 (Tex.Civ.App.—San Antonio 1961), *opinion adopted,* 163 Tex. 381, 355 S.W.2d 502 (1962).

The story of water law in Texas is also the story of its droughts. Texas' longest sustained recorded period of drought was between 1950 and 1957. The judicial focus during those years was upon the Lower Rio Grande—the region from Falcon Dam, not then completed, to the Gulf of Mexico. The region was irrigated by water districts that variously claimed both riparian and appropriative rights. Upper irrigators were depriving citizens of lower municipalities of water essential for basic domestic uses. With no adjudicatory body in Texas, the District Court of Cameron County, acting under the common law, took judicial custody of the scarce waters of the Rio Grande and appointed a watermaster to distribute the waters equitably.[3]

---

**3.** Judge James V. Allred, Federal Judge of the Southern District of Texas, recognizing the void in Texas law on the subject, refused to accept jurisdiction, saying:

I feel that, under all the circumstances of the record and matters of which I may take judicial knowledge, I should decline the invitation of counsel for plaintiffs to "accept the challenge presented in this case, that is, to

help solve the problem of water rights which it looks like the legislature of Texas cannot solve."

[T]he Texas water laws and decisions are in hopeless confusion; * * * their application and administration would be difficult * * *; said laws confer little, if any, real authority upon the State Board of Engineers; that the Board has granted permits on many streams

The procedure, though bitterly contested, was approved. *Hidalgo County Water Improvement District No. Two v. Cameron County Water Control & Improvement Dist. No. 5,* 253 S.W.2d 294, 298 (Tex.Civ.App.—San Antonio 1952, writ ref'd n.r.e.); *Hidalgo County Water Improvement District No. Two v. Cameron County Water Control & Improvement District No. Five,* 250 S.W.2d 941, 945 (Tex.Civ.App.—San Antonio 1952, no writ). The legislature later enacted a statute authorizing the appointment of a watermaster. Tex.Water Code Ann. §§ 5.326, 5.401–5.409.

Ordinary trial rules were inadequate to regulate an entire waterway. The rivers of Texas do not flow according to venue rules. Procedures about parties, venue, and jurisdiction do not fit suits concerning multiple claimants to waters that flow great distances. *Maverick County Water Control & Improvement Dist. v. City of Laredo,* 346 S.W.2d 886 (Tex.Civ.App.—San Antonio 1961, writ ref'd n.r.e.). After a number of subsidiary cases were concluded, the main suit that decided the rights of more than three thousand claimants to the dwindling waters of the Rio Grande finally terminated in a final judgment in 1970.[4] *State of Texas v. Hidalgo County Water Control & Improvement District No. Eighteen,* 443 S.W.2d 728 (Tex.Civ.App.—Corpus Christi 1969, writ ref'd n.r.e.).

The same expensive and sterile judicial process was considered inappropriate for the hundreds of other streams in Texas, so in 1967, the Texas Legislature enacted the Water Rights Adjudication Act which provided in Texas, for the first time, a forum and procedure for the stream-wide adjudication of water rights. Tex.Water Code Ann. §§ 11.301–11.341.

* * * very few of which have been canceled, in such numbers and for such quantities that if riparian rights are given the full effect for which plaintiffs contend, practically every drop of water, normal flow or flood, is "bespoken" * * * particularly true in the Rio Grande Valley.

### The Water Rights Adjudication Act Is Constitutional.

■ The Water Rights Adjudication Act does not, as urged by the riparian claimants in this action, violate the doctrine of separation of powers, and *McKnight,* 11 Tex. 82, 229 S.W. 301, is not authority for striking down the present statutes. The act was designed to avoid the constitutional infirmities of the earlier act. It required all claimants to water rights, except for claims under permits or certified filings, to file sworn statements with the Texas Water Commission by September 1, 1969. Tex. Water Code Ann. § 11.303(c). The same statute required statewide notice of the filing requirement. *Id.* § 11.303(g). In this way, the state for the first time had an inventory of all waters that were being used and claimed. The statute provided further that claims to water would be recognized "only if valid under existing law and only to the extent of the maximum actual application of water to beneficial use without waste during any calendar year from 1963 to 1967, inclusive." *Id.* § 11.303(b).

Section 11.304 of the act authorizes the adjudication of water rights. Section 11.305 provides for an investigation of the claims and a report in writing. Section 11.306 requires public and actual notice of adjudication. Persons claiming water rights of any nature, except for domestic and livestock purposes must then file a timely sworn claim with the department. *Id.* § 11.307. There is notice followed by a hearing on each claim, *id.* § 11.308, and after all evidentiary hearings are completed, the Commission makes a preliminary determination of each claim, *id.* § 11.309, and notifies all parties. *Id.* § 11.312. The parties may then file contests of the preliminary determination. *Id.* § 11.313. After

*Martinez v. Maverick County Water Control & Improvement Dist. No. 1,* 219 F.2d 666, 670 (5th Cir.1955).

4. Smith, *The Valley Water Suit and Its Impact on Texas Water Policy: Some Practical Advice for the Future,* 8 Tex.Tech.L.Rev. 577 (1977); Johnson, *Adjudication of Water Rights,* 42 Tex. L.Rev. 121 (1963).

notice there is a hearing on each contest, *id.* § 11.314, followed by the Commission's final determination, *id.* § 11.315. Provision is made for timely rehearings. *Id.* § 11.316.

When all applications for rehearing are ruled upon, the Commission then files a certified copy of its final determination, together with all evidence presented to or considered by the Commission, in a district court. *Id.* § 11.317. The court then orders the date for filing exceptions to the final determination, the date for the hearings on exceptions, and notifies all parties. *Id.*

Sections 11.320–11.323 are significant changes from the law as it existed in 1921 when this court held that the 1917 Irrigation Act was unconstitutional. Section 11.-320 makes clear that the court shall act independently of the Commission's determination, and that substantial evidence shall not be the standard of review. It is also clear that the entire subchapter would not have been enacted without the inclusion of section 11.320.[5]

A significant difference between the 1917 Irrigation Act and the procedure under the Water Rights Adjudication Act is that the agency does not make the final determination of rights. There is a two-step procedure. The Commission makes its determination which is followed by an automatic and mandatory judicial review. *See Current Problems, Administrative Government in Texas,* 47 Tex.L.Rev. 805, 875 (1969).

■ By statute, the standard of review under the Adjudication Act is neither a substantial evidence review nor a de novo review. It is a review made independently of the Commission's adjudication, and a review exercised on those parts of the Com-

mission's determination to which exceptions were timely leveled. In passing on the exceptions, the court may, as in the case now before us, hear additional evidence. Tex.Water Code Ann. § 11.321. The exceptions are the pleadings which the court acts upon with or without a jury trial. The burden of proof is upon the one who levels the exceptions. *Railroad Commission of Texas v. Magnolia Petroleum Co.,* 130 Tex. 484, 491, 109 S.W.2d 967, 972 (1937). *See also Pacific Live Stock Co. v. Lewis,* 241 U.S. 440, 455, 36 S.Ct. 637, 643, 60 L.Ed. 1084 (1916); *Trapp v. Shell Oil Co.,* 145 Tex. 323, 347–48, 198 S.W.2d 424, 440 (1946); *City of Houston v. Southwestern Bell Tel. Co.,* 263 S.W.2d 169, 172 (Tex.Civ.App.— Galveston 1953, writ ref'd); *Drummey v. State Board of Funeral Directors,* 13 Cal.2d 75, 87 P.2d 848, 854 (1939). We conclude that the act, unlike the statutes construed in *McKnight,* 111 Tex. 82, 229 S.W. 301, and *Southern Canal Co.,* 159 Tex. 227, 318 S.W.2d 619, provides a constitutional method for adjudication.

There is a second reason that the Adjudication Act does not violate the principle of the separation of powers. The reason is expounded in *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961 (1945). Article XVI, section 59a, of the Texas Constitution, the Conservation Amendment, had not been enacted when the statutes involved in *McKnight* were considered. The validity of the review procedures for administrative actions concerning oil and gas conservation was discussed in *Corzelius* and sustained against the same constitutional attack that is now made. The court held that the broad language of the Conservation Amendment

---

**5.** § 11.320. Scope of Judicial Review

(a) In passing on exceptions, the court shall determine all issues of law and fact independently of the commission's determination. The substantial evidence rule shall not be used. The court shall not consider any exception which was not brought to the commission's attention by application for rehearing. The court shall not consider any issue of fact raised by an exception unless the record of evidence before the commission reveals that the question was genuinely in issue before the commission.

(b) A party in interest may demand a jury trial of any issue of fact, but the court may in its discretion have a separate trial with a separate jury of any such issue.

(c) The legislature declares that the provisions of this section are not severable from the remainder of this subchapter and that this subchapter would not have been passed without the inclusion of this section. If this section is for any reason held invalid, unconstitutional, or inoperative in any way, the holding applies to the entire subchapter so that the entire subchapter is null and void.

empowered the legislature to confer upon the Railroad Commission the power to adjust correlative rights in gas fields, subject to the review by the courts. The court rejected the claimed violation of the separation of powers provision of Article II, section 1, of the Texas Constitution.

### The Water Rights Adjudication Act Is Not An Unconstitutional Taking.

■ Riparians along the Guadalupe River also urge that section 11.303 of the Water Code provides for an unconstitutional taking of vested property rights without compensation and is not a valid exercise of the State's police powers. It is true that riparians, whose land grants were acquired before July 1, 1895, have a vested right in the use of the non-flood waters, but that vested right is to a usufructory use of what the state owns. A usufruct has been defined as the right to use, enjoy and receive the profits of property that belongs to another. *Magnolia Petroleum Co. v. Dodd,* 125 Tex. 125, 129, 81 S.W.2d 653, 655 (1935); *Sparks v. Spence,* 40 Tex. 693, 694, 700 (1874); *Cartwright v. Cartwright,* 18 Tex. 626, 628 (1857). Texas holds the title to the waters in a navigable stream in trust for the public. *Motl v. Boyd,* 116 Tex. 82, 111, 286 S.W. 458, 468 (1926); *Landry v. Robison,* 110 Tex. 295, 298–99, 219 S.W. 819, 820–21 (1920); *City of Austin v. Hall,* 93 Tex. 591, 598, 57 S.W. 563, 565 (1900); W. Hutchins, The Texas Law of Water Rights 77 (1961). This court wrote in *Texas Co. v. Burkett,* 117 Tex. 16, 25, 296 S.W. 273, 276 (1927), "The right of Burkett as a riparian owner was one of use only, since the riparian does not own the water which flows past his land." *See Motl v. Boyd,* 116 Tex. at 111, 286 S.W. at 468 (1926); *Rhodes v. Whitehead,* 27 Tex. 304, 309 (1863); *Haas v. Choussard,* 17 Tex. 588, 589 (1856); W. Hutchins, The Texas Law of Water Rights 77–81 (1961).

Many decisions have held that the riparian rights to waters were vested at the time the lands to which they are appurtenant were granted, if granted before July 1, 1895. *See San Antonio River Authority v. Lewis,* 363 S.W.2d 444, 449 (Tex.1962); *Texas Water Rights Commission v. Wright,* 464 S.W.2d 642, 647 (Tex.1971); *Chicago, R.I., & G. Ry. Co. v. Tarrant County Water Control & Improvement Dist. No. 1,* 123 Tex. 432, 447–48, 73 S.W.2d 55, 64 (1934); *Board of Water Engineers v. McKnight,* 111 Tex. 82, 92, 229 S.W. 301, 305 (1921); *Bigham Bros. v. Port Arthur Canal & Dock Co.,* 100 Tex. 192, 201, 97 S.W. 686, 688 (1906); *McGhee Irrigating Ditch Co. v. Hudson,* 85 Tex. 587, 592–93, 22 S.W. 967, 968 (1893); *Mud Creek Irrigation, Agricultural, & Manufacturing Co. v. Vivian,* 74 Tex. 170, 173, 11 S.W. 1078, 1079 (1889); *Tolle v. Correth,* 31 Tex. 362, 365 (1868).

We have also held that riparian rights are an incident of the land ownership. *Magnolia Petroleum Co. v. Dodd,* 125 Tex. 125, 128–29, 81 S.W.2d 653, 655 (1935); *Fleming v. Davis,* 37 Tex. 173 (1872); *Parker v. El Paso County Water Improvement Dist. No. 1,* 116 Tex. 631, 642–43, 297 S.W. 737, 742 (1927); *Bigham Bros. v. Port Arthur Canal & Dock Co.,* 91 S.W. 848, 853 (Tex.Civ.App. 1905), *reversed and remanded on other points,* 100 Tex. 192, 97 S.W. 686 (1906).

■ This court has not previously been faced with the precise and narrow issue that is here presented. Our question is whether the State of Texas can constitutionally limit riparian claimants to that quantity of water actually beneficially used during any one of the five years between 1963 and 1967. Tex.Water Code Ann. § 11.303(b). The riparians in this case are entitled to and have received the full measure of their usufruct to the extent of their maximum beneficial use during the test period from 1963 through 1967. Article 11.303 does not deprive riparians of any waters they beneficially used during the inventory period. The complaint is that continued non-use of the usufructory right may not be abrogated. We hold that, after notice and upon reasonable terms, the termination of the riparians' continuous non-use of water is not a taking of their property.

A similar contention that water rights were unlawfully taken was urged in *Texas Water Rights Commission v. Wright,* 464

S.W.2d 642 (Tex.1971). Appropriated water rights, like riparian rights, are vested. *Id.* at 646–47. *See also State Board of Water Engineers v. Slaughter,* 382 S.W.2d 111 (Tex.Civ.App.—San Antonio 1964), *per curiam,* 407 S.W.2d 467 (Tex.1966). We held in *Wright* that, notwithstanding the vested nature of the right, water permits could be cancelled upon proof of ten years of non-use, saying:

> The permittees did not acquire the right of non-use of water. Common to the law of the western arid regions and of appropriation law generally is the idea that non-use of appropriated waters is a waste of the water. Once water is appropriated, its availability to another user is reduced or defeated, and if the permittee does not use a substantial portion of it the water will run unused into the sea. A workable system of appropriated waters has produced the general rule that the beneficial use of waters is the conservation of the resource, whereas, the non-use of appropriated waters is equivalent to waste.

464 S.W.2d at 647.

We regard the non-use of the State's ordinary flow of its streams equally wasteful and for similar reasons. As expressed in *Wright,* "the State, in administering its water resources, is under a constitutional duty to conserve water as a precious resource . . . ." *Id.* at 648. The riparian's vested usufructory right, like a permittee's vested right is the right to use the resource beneficially—not waste it.

Texas modeled its Adjudication Act after the Oregon statutes and almost seventy years ago, the same contention here urged was before the Oregon Supreme Court in *In re Willow Creek,* 74 Or. 592, 144 P. 505 (1914). In rejecting the argument that the unused riparian rights had been unconstitutionally taken, the Oregon court wrote:

> The right to the use of water is a valuable property right guaranteed to every citizen. It cannot be arbitrarily nor unreasonably interfered with by the legislative department of the state.

> Water rights, like all other rights, are subject to such reasonable regulations, as are essential to the general welfare, peace, and good order of the citizens of the state, to the end that the use of water by one, however absolute and unqualified his right thereto, shall not be injurious to the equal enjoyment of others entitled to the equal privilege of using water from the same source, nor injurious to the rights of the public.

> . . . . .

> The requirements of the statute . . . are not arbitrary, unreasonable, nor unduly burdensome . . . . They are salutary and in the interest of an orderly regulation of the use of water to be made by skilled officers who have particular knowledge in that line.

74 Or. at 616–17, 144 P. at 514.

Other western states have reached a similar result by treating the statutory scheme as a reasonable exercise of the police power. *Gin Chow v. City of Santa Barbara,* 217 Cal. 673, 705, 22 P.2d 5, 16–17 (1933); *Williams v. City of Wichita,* 190 Kan. 317, 333–34, 374 P.2d 578, 591 (1962).

The United States Supreme Court in *Texaco, Inc. v. Short,* 454 U.S. 516, 102 S.Ct. 781, 788, 70 L.Ed.2d 738 (1982), upheld the Indiana Dormant Mineral Interests Act which provided that a severed mineral interest that was not used for a period of twenty years automatically lapsed and reverted to the current surface owner, unless the owner took certain protective steps.[6]

---

6. "The Act reflects the legislative belief that the existence of a mineral interest about which there has been no display of activity or interest by the owners thereof for a period of twenty years or more is mischievous and contrary to the economic interests and welfare of the public. The existence of such stale and abandoned interests creates uncertainties in titles and constitutes an impedi-

ment to the development of the mineral interests that may be present and to the development of the surface rights as well. The Act removes this impediment by returning the severed mineral estate to the surface right owners. There is a decided public interest to be served when this occurs. The extinguishment of such an interest makes the entire productive potential of the property again

The court in holding there was no taking wrote:

> We have concluded that the State may treat a mineral interest that has not been used for 20 years and for which no statement of claim has been filed as abandoned; it follows that, after abandonment, the former owner retains no interest for which he may claim compensation. *It is the owner's failure to make any use of the property*—and not the action of the State—that causes the lapse of the property right; there is no "taking" that requires compensation. The requirement that an owner of a property interest that has not been used for 20 years must come forward and file a current statement of claim is not itself a "taking."

102 S.Ct. 781, 792 (emphasis added).

The riparians also urge that the Commission had no authority to declare the North and South Forks of the Guadalupe River statutory navigable streams, and that in doing so, the Commission made an unauthorized decision affecting the title to their lands. The riparians reason that they hold patents from the state, which include the bed of the stream, that the surveys for their lands crossed the streams instead of fronting one-half of the square on the river and the line running at right angles with the general course of the stream.[7] They argue that the General Land Office made its determination of non-navigability at the time of the original surveys and the patents. They argue further that the decision by the Commission was a judgment concerning their title to the stream bed which cannot now be divested by an administrative decision.

Title to the bed of the stream is not here in issue.[8] The issue before us is navigability and the water rights associated with that decision. In our opinion, these matters are settled by *Diversion Lake Club v. Heath,* 126 Tex. 129, 86 S.W.2d 441 (1935), and *Port Acres Sportsman's Club v. Mann,* 541 S.W.2d 847 (Tex.Civ.App.—Beaumont 1976, writ ref'd n.r.e.).

We affirm the judgments of the courts below.

---

available for human use." [*Short v. Texaco, Inc.,*] Ind., 406 N.E.2d [625] at 627.
102 S.Ct. at 788.

**7.** Art. 5302. Surveys on navigable streams

All lands surveyed for individuals, lying on navigable water courses, shall front one-half of the square on the water course and the line running at right angles with the general course of the stream, if circumstances of the lines previously surveyed under the laws will permit. All streams so far as they retain an average width of thirty feet from the mouth up shall be considered navigable streams within the meaning hereof, and they shall not be crossed by the lines of any survey. All surveys not made upon navigable water courses shall be in a square, so far as lines previously surveyed will permit.
Tex.Rev.Civ.Stat.Ann. art. 5302.

**8.** For a discussion concerning title to the bed of streams see *State v. Bradford,* 121 Tex. 515, 50 S.W.2d 1065 (1932).