# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00732-CV

**City of Highland Haven, Texas; and Burnet County, Texas, Appellants**

**v.**

**Eugene Taylor and Charles Fenner, Appellees**

### FROM THE DISTRICT COURT OF BURNET COUNTY, 33RD JUDICIAL DISTRICT
### NO. 39505, HONORABLE GUILFORD L. JONES III, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellees Eugene Taylor and Charles Fenner brought suit against Highland Haven and Burnet County seeking damages for inverse condemnation caused by the County's construction of a bridge upgradient from their properties. The City and County filed pleas to the jurisdiction, asserting that their governmental immunity barred suit because Taylor and Fenner's pleadings did not support claims for inverse condemnation. The district court denied the pleas. The City and County appeal. For the reasons set forth below, we reverse the district court's denial of the pleas to the jurisdiction and render judgment dismissing Taylor and Fenner's claims.

### Factual and Procedural Background

Taylor and Fenner each own lots located within the city limits of Highland Haven, which is located on Lake LBJ in the Texas Hill Country. Lake LBJ, one of the six Highland Lakes

created by construction of dams along the Colorado River upstream from Austin, Texas,[1] is owned and operated by the Lower Colorado River Authority (LCRA). Taylor's and Fenner's lots in Highland Haven are adjacent to, and have boat docks extending into, an arm of Lake LBJ called Wolf Creek Channel. Wolf Creek Channel is a man-made extension of Wolf Creek, which is a wet-weather creek above where its bed meets the water from Wolf Creek Channel/Lake LBJ.

In 2007, heavy flooding damaged the low-water crossing at the intersection of County Road 125 and Wolf Creek Channel, where Wolf Creek meets Wolf Creek Channel upgradient from Taylor's and Fenner's properties. County Road 125 is the only public access to Highland Haven and, according to the parties, any heavy rainfall in the area flooded the low-water crossing at Wolf Creek Channel, cutting off Highland Haven. Instead of repairing the low-water crossing, Highland Haven decided to replace it with a bridge paid for from funds obtained from the Federal Emergency Management Agency. Ultimately, Burnet County, the entity charged with maintaining and repairing County Road 125, constructed a "box bridge"—i.e., reinforced, precast concrete boxes topped by a roadway—at the location. The bridge was completed during the summer of 2009.

After the next heavy rainfall, sometime in late 2009, property owners in the area complained to the LCRA about sediment accumulation in Wolf Creek Channel, asserting that the new bridge had caused sediment to accumulate in the channel downgradient from the bridge, making the channel impassable for small water craft. LCRA investigated and concluded in a written report that "natural sedimentation is responsible for nearly all of the sediment load entering Lake LBJ via"

---

[1] The six Highland Lakes, from north to south or upstream to downstream, are Buchanan, Inks, LBJ, Marble Falls, Travis, and Austin.

Wolf Creek Channel and that there was no violation of the Highland Lakes Watershed Ordinance.[2] LCRA then recommended repair of the erosion in the immediate vicinity of the bridge. LCRA also noted that the man-made canals in the area[3] frequently require dredging to restore navigation caused by sedimentation, especially after flooding. A property owner in the area made a similar complaint to the Texas Commission on Environmental Quality (TCEQ). After its own investigation of the bridge and channel, TCEQ concluded that there were no violations of the Water Code, but that it appeared that the bridge project had created "a settling pool in the creek where sediment originating further upstream settles out."

At some point thereafter, Taylor and Fenner filed the underlying cause of action against Highland Haven and Burnet County, arguing that the sedimentation of Wolf Creek Channel constituted inverse condemnation of their waterfront properties because they were no longer able to use the water in the channel as access to and from their property to Lake LBJ. In response, Highland Haven and Burnet County filed pleas to the jurisdiction, arguing that Taylor and Fenner's claims were barred by governmental immunity because their pleading did not support a claim for inverse condemnation. The district court denied the pleas. It is from this interlocutory order denying their pleas to the jurisdiction that Highland Haven and Burnet County now appeal. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8) (allowing interlocutory appeal from order denying governmental entity's plea to jurisdiction).

---

[2] LCRA's enabling act gives it the authority to "adopt ordinance rules with regard to the pollution" and the power to enforce those rules. *See* Tex. Spec. Dist. Code § 8503.004(q); *see generally id.* §§ 8503.001–.031 (LCRA enabling act). A copy of the Highland Lakes Watershed Ordinance is available at http://www.lcra.org/water/quality/watershed-management-ordinance.

[3] According to the record, Wolf Creek Channel is a man-made channel.

3

**Analysis**

In addressing Burnet County's and Highland Haven's jurisdictional challenge, we consider whether Taylor and Fenner have alleged facts that would affirmatively establish the district court's subject-matter jurisdiction to adjudicate Taylor's and Fenner's claims. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004). That determination is a question of law that we review de novo. *Id.* at 226.

To invoke subject-matter jurisdiction in this case, Taylor and Fenner must overcome the City's and Burnet County's governmental immunity. Governmental immunity is a common-law doctrine that derives from the sovereign immunity that shields the State, its agencies, and its officials. *See, e.g.*, *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011); *Tooke v. City of Mexia*, 197 S.W.3d 325, 345 (Tex. 2006). It protects local government units, such as Highland Haven and Burnet County, when those units are performing "governmental" functions, which are essentially those in which a unit is deemed to be acting as an arm of the State and in the interest of the general public. *See City of Galveston v. State*, 217 S.W.3d 466, 469 (Tex. 2007). Governmental immunity deprives courts of subject-matter jurisdiction over suits brought against governmental units and their agents unless the State has consented to suit through legislative waiver of that immunity.

One such waiver is the clear and unambiguous limited waiver of immunity for valid claims under the "takings clause" of the Texas Constitution, which provides that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made . . . ." Tex. Const. art. I, § 17; *see Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980) (holding that "Constitution itself is the authorization for compensation for the destruction of property and is a waiver of governmental immunity for [takings claims]"). Thus, if

4

the government appropriates property without paying adequate compensation, the owner may bring an inverse condemnation claim against the government to recover the resulting damages without running afoul of governmental immunity. *See State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007) (noting sovereign immunity does not shield State from takings claim (citing *General Servs. Comm'n v. Little–Tex Insulation Co., Inc.*, 39 S.W.3d 591, 598 (Tex. 2001)). Conversely, "[a] trial court lacks jurisdiction and should grant a plea to the jurisdiction where a plaintiff 'cannot establish a viable takings claim.'" *Texas Dep't of Transp. v. A.P.I. Pipe & Supply, LLC*, 397 S.W.3d 162, 166 (Tex. 2013) (quoting *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 491 (Tex. 2012)). Whether particular facts constitute a taking is a question of law. *Little–Tex*, 39 S.W.3d at 598 (citing *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 936 (Tex. 1998)).

To establish a takings claim, a plaintiff must plead that the governmental agency (1) intentionally performed certain acts in the exercise of its lawful authority (2) that resulted in taking, damaging, or destroying the plaintiff's property (3) for public use. *Little–Tex*, 39 S.W.3d at 598 (citing *Steele*, 603 S.W.2d at 788–92). In this appeal, Highland Haven and Burnet County challenge the second of these three elements, arguing that Taylor and Fenner lack a property interest in Wolf Creek Channel that would support their takings claims. "'[I]t is fundamental that, to recover under the constitutional takings clause, one must first demonstrate an ownership interest in the property taken,'" and if one cannot do so, "the takings claim is not viable and the trial court lacks jurisdiction." *A.P.I. Pipe*, 397 S.W.3d at 166 (quoting *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 644 (Tex. 2004)).

In their live pleading, Taylor and Fenner assert as their property rights the ability to use the water in Wolf Creek Channel for access to and from Lake LBJ: "The construction and

5

design of the public 'box bridge' to benefit the public has caused unreasonable interference with [Taylor's and Fenner's] right[s] to use and enjoy [their respective] propert[ies]" and "has resulted in [Taylor and Fenner] from [sic] being unable to access [their respective] propert[ies] from Lake LBJ and from being unable to access Lake LBJ from [their respective] propert[ies]." In other words, Taylor and Fenner argue that they have a property interest in using the water of Wolf Creek Channel as a means of access to and from Lake LBJ because their properties are adjacent to the channel. This right that Taylor and Fenner describe is in the nature of a right granted to properties that can claim common-law riparian[4] rights: "The first, and most basic, right of a riparian owner is access to the water. Access means the right of ingress and egress to one's land by way of water, or to the water from the land." *Water & Water Rights* § 6.01(a)(1) (3d ed. 2014) (footnotes omitted); *see, e.g.*, *Hollan v. State*, 308 S.W.2d 122, 125 (Tex. Civ. App.—Fort Worth 1957, writ ref'd n.r.e.) ("[T]he riparian rights of the owner of the fee includes free access to the water and the right to have removed any structures used by others which impede or hamper those rights."); *State v. R. E. Janes Gravel Co.*, 175 S.W.2d 739, 744 (Tex. Civ. App.—Austin 1943) (noting that "riparian owner has at all times the right to access to the waters of the stream"), *judgment modified by Maufrais v. State*, 180 S.W.2d 144 (Tex. 1944); *Black's Law Dictionary* 1524 (10th ed. 2014) (defining "riparian right" as the "right of a landowner whose property borders on a body of water"); *see also In re the Adjudication of the Water Rights of Upper Guadalupe Segment of the Guadalupe River Basin*,

----

[4] Although the term "littoral" would be more appropriate in our discussion of the rights associated with land adjacent to the waters of Lake LBJ, we will use the phrase "riparian" for the reasons discussed in *Cummins v. Travis Cnty. Water Control & Improvement Dist. No. 17*, 175 S.W.3d 34, 42–43 (Tex. App.—Austin 2005, pet. denied). *See Black's Law Dictionary* 1076, 1524 (10th ed. 2014) (defining "littoral" as relating to "the coast or shore of an ocean, sea, or lake" and "riparian" as relating to "the bank of a river or stream").

642 S.W.2d 438, 444 (Tex. 1982) (noting that riparian owner has vested right in use of non-flood waters that flow past land); *Cummins v. Travis Cnty. Water Control & Improvement Dist. No. 17*, 175 S.W.3d 34, 41–43 (Tex. App.—Austin 2005, pet. denied) (discussing riparian rights in Texas). Although Texas does still recognize riparian rights under certain limited circumstances,[5] under the common law riparian rights attach only to real property that is adjacent to a "natural" river or lake, not an "artificial" or man-made waterway and, further, only to the "normal flow" of the waters in those natural waterways, as opposed to "floodwaters." *See In re Upper Guadalupe*, 642 S.W.2d at 444 (noting riparian right is to "non-flood waters"); *Cummins*, 175 S.W.3d at 44–45 (citing *Humphreys-Mexia Co. v. Arseneaux*, 297 S.W. 225, 229 (Tex. 1927) ("It is an elementary rule that riparian rights attach to all natural lakes and ponds, regardless of origin."); *Motl v. Boyd*, 286 458, 470 (Tex. 1926) (holding that riparians have no vested right in flood water); *Roberson v. Red Bluff Water Power Control Dist.*, 142 S.W.2d 248, 254 (Tex. Civ. App.—El Paso 1940, no writ) (waters impounded by dam are flood waters and, thus, do not confer riparian rights)). Taylor and Fenner's pleadings, however, affirmatively establish that their properties are adjacent to a man-made waterway filled with water impounded by a dam.

Taylor and Fenner's live pleading asserts rights stemming from the fact that their properties are adjacent to the Wolf Creek Channel, an arm of Lake LBJ: "The properties . . . have boat docks on Wolf Creek Channel which flows into Lake LBJ." It is widely known, easily

---

[5] *See* Tex. Water Code §§ 11.001 ("This code does not recognize any riparian right in the owner of any land the title to which passed out of the State of Texas after July 1, 1895."), .134(3)(B) (appropriations may not impair vested riparian rights), .303 (requiring notice of filing requirements, that riparian claims be filed by Sept. 1, 1969, placing limits on riparian rights); *In re the Adjudication of the Water Rights of the Upper Guadalupe Segment of the Guadalupe River Basin*, 642 S.W.2d 438, 444–46 (Tex. 1982) (discussing *id.*).

ascertainable, and undisputed by Taylor and Fenner that Lake LBJ is an man-made lake that was created by the impoundment of the Colorado River by the Wirtz Dam. *See, e.g.*, LCRA, *Wirtz Dam & Lake LBJ* (available at http://www.lcra.org/water/dams-and-lakes/Pages/wirtz-dam.aspx) (accessed Feb. 5, 2015); Seth D. Breeding, *Lake Lyndon B. Johnson*, Handbook of Texas Online (available at http://www.tshaonline.org/handbook/online/articles/rol51) (accessed Feb. 5, 2015); *see also Ulbricht v. Friedsam*, 325 S.W.2d 669, 676 (Tex. 1959) (discussing 1938 formation of Lake Buchanan, another Highland Lake, by damming of Colorado river); *Cummins*, 175 S.W.3d at 45 (noting that Lake Travis, another Highland Lake created by damming of Colorado River in 1950s, is man-made lake). As such, we take judicial notice of the fact that Lake LBJ is a man-made lake consisting of the impounded waters of the Colorado River. *See Grimes v. State*, 135 S.W.3d 803, 821 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (holding that appellate court may take judicial notice of facts that trial court could have judicially noticed as long as those facts are "notorious, well known, or easily ascertainable"); *Lemmon v. United Waste Sys., Inc.*, 958 S.W.2d 493, 498 (Tex. App.—Fort Worth 1997, pet. denied) (same) (citing *Centex Corp. v. Dalton*, 810 S.W.2d 812, 824 (Tex. App.—San Antonio 1991) (op. on reh'g) (quoting 1 R. Ray, *Texas Law of Evidence Civil & Criminal* § 185 (Texas Practice, 3d ed. 1980, Supp. 1990)), rev'd on other grounds, 840 S.W.2d 952 (Tex. 1992)); *see also Harper v. Killion*, 348 S.W.2d 521, 522–26 (Tex. 1961) (taking judicial notice on appeal). Therefore, even assuming such rights would be recognized under the Water Code,[6] Taylor and Fenner's respective properties cannot be vested with common-law riparian rights, including the right of access asserted here, because those

---

[6] *See* supra note 5.

8

properties are adjacent to a man-made waterway. *See Cummins*, 175 S.W.3d at 45 (holding that property on Lake Travis was not vested with riparian rights because lake on which it was located is an artificial, or man-made, lake). As such, Taylor and Fenner have no property interest in the use of the water in Wolf Creek Channel such that they can meet the second element of a takings claim. *See A.P.I. Pipe*, 397 S.W.3d at 166. A party that cannot establish a viable takings claims against the governmental entity is barred from making that claim under principles of governmental immunity. *See id.*

Taylor and Fenner argue that, because they have already constructed boat docks on the property and have accessed Lake LBJ via Wolf Creek Channel in the past, their property interest is similar to that enjoyed by property that abuts a road or highway. *See, e.g.*, *State v. Delany*, 197 S.W.3d 297, 299 (Tex. 2006) ("Texas has long recognized that property abutting a public road has an appurtenant easement of access guaranteeing ingress to and egress from the property. Under the Texas Constitution, a compensable taking has occurred if the State materially and substantially impairs access to such property." (citing *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996); *DuPuy v. City of Waco*, 396 S.W.2d 103 (Tex. 1965))). But we can find no takings cases in Texas, nor do appellees cite to any, that have extended a property owner's right to access an adjacent road to include the right to access an adjacent waterway in the absence of riparian rights to do so. Further, we are mindful of the long and complicated history of water law in this state and of the Legislature's pronouncements in this area. *See In re Upper Guadalupe*, 642 S.W.2d at 439–42 (describing evolution of Texas water law). At one time, Texas recognized both the law of riparian rights and also the law of appropriation of waters, but in 1967, with the enactment of the Water Rights

9

Adjudication Act,[7] Texas unified these dual systems and set up an adjudicative system for establishing water rights. *See id.* The Legislature also limited common-law riparian rights by, for example, establishing that only property with a chain of title tracing to "a grant from the sovereign that occurred before July 1, 1895," can be vested with riparian rights, *see* Tex. Water Code § 11.001(b) ("This code does not recognize any riparian right in the owner of any land the title to which passed out of the State of Texas after July 1, 1895."), and by requiring that claims for riparian rights have been filed by September 1, 1969, *see id.* § 11.303(c). For this Court to determine that Taylor and Fenner's properties are vested with some right in the impounded water of the man-made Wolf Creek Channel, itself an arm of the man-made Lake LBJ, would require not only departing from this legislatively-created system of water rights, but also accepting a previously unrecognized common-law water right. *See In re the Adjudication of the Water Rights of the Brazos III Segment of the Brazos River Basin*, 746 S.W.2d 207, 211 (Tex. 1988) (noting strong public-policy concerns regarding granting water rights outside the adjudication process established in the Water Code). As an intermediate appellate court, we are in no position to do so. *See Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 564–65 (Tex. App.—Austin 2004, no pet.) ("As an intermediate appellate court, we are not free to mold Texas law as we see fit but must instead follow the precedents of the Texas Supreme Court unless and until the high court overrules them or the Texas Legislature supersedes them by statute.").

---

[7] The first version of the Water Rights Adjudication Act was enacted in 1967. *See* Water Rights Adjudication Act, 60th Leg., R.S., ch. 45, §§ 1–15, 1967 Tex. Gen. Laws 86, 86–94 (current version in Chapter 11, sections 11.301–.341, of the Texas Water Code). The supreme court held the act constitutional in *In re Upper Guadalupe*, 642 S.W.2d at 442–46.

We sustain Highland Haven's and Burnet County's first issue on appeal. Having done so, we need not address Highland Haven's remaining issues regarding standing and state police power.

**Conclusion**

Having determined that Taylor and Fenner's pleadings affirmatively demonstrate that they have no property interest sufficient to support a takings claims and, thus, that the district court lacked jurisdiction over those claims, we reverse the district court's order denying the pleas to the jurisdiction and render judgment dismissing Taylor and Fenner's claims for lack of subject-matter jurisdiction. *See Miranda*, 133 S.W.3d at 226–27 ("If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend.").

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Puryear and Goodwin

Reversed and Rendered

Filed: February 12, 2015

11